| PEATROSS, J.
Plaintiffs, Betty Langford, Lisa Lang-ford Doria and Patti Langford, on behalf of the estate of Thomas Langford, appeal the judgment of the trial court dismissing their medical malpractice claim against Defendants, Schumpert Medical Center (“Schumpert”) and Dr. Charles Black. For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL HISTORY

On December 8, 1988, Mr. Langford was involved in an automobile accident in Pano-la County, Texas, when he rear ended a stationary 18-wheel tractor truck and trailer. The impact was so severe that Mr. Langford’s vehicle was damaged to the extent that he had to be cut from it by rescue workers. Mr. Langford subsequently died on December 23, 1988. The autopsy report listed the primary cause of death as a thoracic aortic laceration at the ninth or tenth thoracic vertebrae, or T9-10, which hemorrhaged and ruptured. The secondary cause of death was reported as an ischaemic infarction of the small intestine, or bowel, with massive gastrointestinal hemorrhage.[1]
*1039 Following the accident, Mr. Langford was initially taken to Panola General Hospital (“Panola”) where x-rays revealed a displaced, or subluxation fracture of, his thoracic spine at T9-10 and a fracture of his left seventh rib. Mr. Langford also had a bilateral blood pressure differential in his upper extremities as reflected in the nurses’ notes from Panola.[2] The nurses’ notes also indicated that, on at least two occasions, the bilateral blood pressure differential was brought to the attention of Dr. J. Smith, the Panola emergency room physician attending Mr. Langford. It Lwas determined that Mr. Langford’s thoracic spine fracture was going to require surgery, so preparations were made for ■ him to be transferred to Schumpert. It is disputed whether or not the nurses’ notes indicating the bilateral blood pressure differential were included in the records that were initially sent with Mr. Langford when he was transferred from Panola to Schum-pert.
Blandean Roland was employed as a critical care registered nurse with Panola at the time of Mr. Langford’s accident. Ms. Roland assisted with Mr. Langford’s care and was assigned to accompany him during the transfer to Schumpert. Ms. Roland testified that it was her duty and her practice before such a transfer to double check the contents of the Panola chart to ensure it was complete. Ms. Roland, however, did not have an independent recollection that she did so in this case.
Dr. David Cavanaugh, the neurosurgeon who admitted Mr. Langford to Schumpert, testified that he spoke with Dr. Smith by telephone, but that the bilateral blood pressure differential was not mentioned. When Mr. Langford was admitted to Schumpert, Dr. Cavanaugh determined that Mr. Langford’s overall medical condition was unstable; and, therefore, surgery was delayed. Dr. Michael Briggs, a pul-monologist, also examined Mr. Langford upon admission to Schumpert and noted that he was suffering from hypoxemia, or a decreased level of oxygen in his blood. Dr. Briggs ordered respiratory therapy for Mr. Langford to correct this condition.
During the 15 days that Mr. Langford was at Schumpert, his condition never improved significantly enough for surgery to be performed. Mr. Langford developed significant lung congestion; and he also began to develop a gastrointestinal problem known as an ileus, or paralysis, of the small intestine, or bowel, so that digestion ceases. Dr. Charles Black, a general surgeon, was called | sin by Dr. Cavanaugh to monitor and treat Mr. Langford for the ileus and other possible internal injuries.
On December 9, a nasogasteric tube (“NG tube”) was placed in Mr. Langford’s stomach to alleviate the nausea he was experiencing. After a severe trauma, such as that which Mr. Langford suffered, a person’s digestive tract may take some time to begin to function properly again. The NG tube is used both to remove gastric contents and to tube feed if necessary.
On December 13, Mr. Langford’s gastrointestinal condition improved and he was able to evacuate his bowels. By December 15, he was able to eat and hold down solid food. On December 17, however, Mr. Langford had a relapse and began vomiting, requiring replacement of the NG tube. Dr. Black checked Mr. Langford’s amylase level on that date, which was normal, indicating there was no ischaemic infarction of Mr. Langford’s gastrointestinal tract. Mr. Langford’s condition again improved and he began tolerating tube feeding by December 21. On December 22, Dr. Black signed off on Mr. Langford’s chart indicating it was no longer necessary for him to monitor Mr. Langford on a daily *1040 basis unless there was a change in his condition. At approximately 11:00 p.m. on December 22, Mr. Langford’s blood pressure and lower extremity pulse rate began dropping. At 12:30 a.m. on December 23, Mr. Langford suffered a massive hemorrhage of his small intestine, exsanguinated and was pronounced dead at 1:00 a.m.
During Mr. Langford’s treatment, Dr. Black visited him each morning and noted, as did the nurses throughout each day, that Mr. Langford’s abdomen was soft, non-tender and not distended and that there were bowel sounds present, albeit less active than normal. These continued findings indicated there was no hemorrhage or other internal damage to Mr. Langford’s gastrointestinal tract. Portable chest x-rays were also taken on a daily basis which showed no internal |4changes or widening of the mediastinum.[3] Mr. Langford’s pulse rate was checked at all four extremities three times a day and remained normal.
Dr. Black, Dr. Cavanaugh and Dr. George Beach, Dr. Cavanaugh’s partner who saw Mr. Langford on Dr. Cavanaugh’s days off, testified that the thoracic vertebral surgery continued to be postponed due to the condition of Mr. Langford’s lungs, not his abdomen. Mr. Langford was hypoxic when he was transferred to Schumpert; and, despite respiratory therapy, his oxygen level continued to drop to the point that he was placed on a ventilator on December 20. Mr. Langford was not removed from the ventilator until his death.
In accordance with the procedural requirements of La. R.S. 40:1299.47, this matter was first heard before a medical review panel. The panel determined that Dr. Black did not commit medical malpractice in his treatment of Mr. Langford. This matter was subsequently tried by a jury which unanimously found that Dr. Black did not commit medical malpractice. It is from this decision that Plaintiffs appeal.

DISCUSSION

Medical malpractice is defined as any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient. ... La. R.S. 40:1299.41. In order for Plaintiffs to prevail in a medical malpractice action, La. R.S. 9:2794 requires, in part, as follows:
(1) ... where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
| s(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Plaintiffs assert as their single assignment of error that the jury committed manifest error when it failed to find that Dr. Black violated the standard of care of a general surgeon in this matter. A physician, however, is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Id; Fluck v. Coffman, 32,100 (La.App.2d Cir.9/22/99), 742 So.2d 79; Warren v. Everist, 30,187 (La.App.2d Cir.1/21/98), 706 So.2d 593.
*1041 Plaintiffs place great emphasis on the fact that Dr. Black did not order an aorto-gram which would have located the tear in Mr. Langford’s aorta, complaining this was medical malpractice on the part of Dr. Black. For several reasons, which will be outlined below, we disagree and do not find any merit in this argument.

Bilateral Blood Pressure Differential

During trial, several experts testified that a bilateral blood pressure differential is classically indicative of an injury to the aorta and mandates that an aorto-gram be performed. There was, however, testimony to the contrary. Some other experts testified that the bilateral blood pressure differential alone was not sufficient to warrant an aortogram, while still other experts testified that a bilateral blood pressure differential is not indicative of an aortic injury at the level of T9-10. An aortogram is an invasive test in which a large gauge needle is inserted in the femoral artery and a catheter is threaded through the needle and guided to the arch or top part of the aorta. Dye is then injected into the aorta under pressure, which lfican be seen if it leaks from the aorta, and indicates the location of an injury if one exists.
Aside from being invasive, several experts testified that an aortogram is not free of risks and its utility must be measured against these risks. Dr. Black testified concerning those risks, stating that, for example, if a person has any plaque build-up in his aorta, the pressure of the dye can dislodge it and cause a stroke. Other risks include allergic reactions to the dye, as well as serious, irreversible damage to the kidneys if they are already stressed, bruised or traumatized, for instance, from an automobile accident.
Dr. David Richardson, an expert in general, thoracic and vascular surgery, testified on behalf of Dr. Black. Dr. Richardson testified similarly to Dr. Black regarding the risks of an aortogram. In addition, he noted that a patient would have to be moved from ICU to radiology to have an aortogram performed. He opined that someone in Mr. Langford’s condition, with an unstable thoracic fracture or subluxation, is at further risk because being moved may result in paralysis. A further risk which Dr. Richardson noted is that the pressure from the dye could actually cause an already injured aorta to rupture, resulting in near instantaneous death.
Dr. Rod Yeager, an expert in thoracic and cardiovascular surgery, also testified about the risks of an aortogram. In addition to those risks already discussed herein, Dr. Yeager noted that the addition of fluid into the aorta may result in a fluid overload and cause congestive heart failure.
Dr. Black testified that a differential of 30 to 40 millimeters of mercury between the blood pressure in the left and right arm can be an indication that there is an injury to the aorta.[4] Dr. Black, however, testified that he was not privy to the Deharts from Panola that indicated Mr. Langford had exhibited differentials in that range. Dr. Black testified that he did not see the Panola nurses’ notes that showed the differential, opining that, perhaps, they were not originally transferred with Mr. Langford. Several other members of Mr. Langford’s team of treating physicians testified ■ that they were not aware of the Panola nurses’ notes during the time they were treating Mr. Langford.
*1042 Further, several experts testified that a bilateral blood pressure differential was not indicative of an aortic injury at such a low level as T9-10 and that the differential alone was not enough to warrant an aorto-gram with its inherent risks.
Dr. Black testified concerning the significance of a bilateral blood pressure differential, stating it would be indicative of an aortic injury at a level above the subclavi-an artery which supplies blood to the upper extremities. In his opinion, a more reliable indicator of a lower aortic injury, such as at T9-10, is the pulse rate in the lower extremities. As stated above, the pulse rate in Mr. Langford’s legs was checked three times a day, once per nursing staff shift, and it remained strong.
Dr. Beach opined that a bilateral blood pressure differential would indicate an injury at T2-3 or higher, at or near the subclavian artery, but not at T9-10. Dr. Cavanaugh also opined that a bilateral blood pressure differential would indicate an aortic injury at a higher level than T9-10. Dr. Dean Griffin, an expert in general surgery who testified on behalf of Dr. Black, similarly testified that a bilateral blood pressure differential would indicate an injury at a higher level.
Dr. Richardson, whose level one trauma unit treats 15 to 20 patients with aortic injuries a year, testified that he did not believe a bilateral blood pressure differential was indicative of an aortic injury. In his opinion, an aortic injury is |sdifficult to diagnose since there are no absolute signs. They are a common cause of death in motor vehicle accidents, but generally at the scene. According to Dr. Richardson, rarely does a person survive an aortic injury long enough to get to the hospital. In Dr. Richardson’s opinion, a chest x-ray can show a widened mediastinum, but only 9 to 12 percent of those patients will actually have an aortic injury. Mr. Langford’s x-rays, which were taken on a daily basis, did not show a widened mediastinum. Dr. Richardson opined that he saw no indication that an aortogram was warranted.
Dr. Yeager testified that a bilateral blood pressure differential is only a significant indication of an aortic injury if there was something else to support it. Dr. Yeager defined other significant factors to be x-rays showing a widened mediastinum, a blurring of the aortic shadow, blood on the left side of the chest, deviation of the esophagus or compression of the wind pipe, none of which were shown on any of Mr. Langford’s multiple x-rays. Dr. Yeager also referred to the lack of, or diminished, pulse rate in the lower extremities.
Dr. Joseph Bussy, an expert in general surgery who testified on behalf of Plaintiffs, stated that the fact that Mr. Lang-ford suffered from deceleration injuries, such as the subluxation at T9-10, was enough of an indication of an aortic injury to warrant an aortogram. The addition of the bilateral blood pressure differential of more than five to ten millimeters of mercury is “very suggestive” of an aortic injury and would “justify” an aortogram. He found this to be true even though the bilateral blood pressure differential was indicative of a higher level injury, and it was his opinion that Dr. Black should have performed the aortogram because it still would have shown the aortic injury at T9-10.
In response to this argument, however, Dr. Richardson stated:
... what you are asking Dr. Black to do is to do things by serendipity. To do something for the wrong reason and accidentally stumble on it and then treat it and that is no standard of any kind of |9way of making a diagnosis I am aware of.... I don’t understand that logic .... that seems a strange logic to me to hold somebody accountable for not accidentally finding something.
We agree, as did the jury.
Finally, we note the testimony of Dr. Beach, Dr. Yeager and Dr. Richardson that the subluxation of Mr. Langford’s thoracic spine at the same level as the aortic injury was not the cause of the aortic injury. Contrary to Dr. Bussy’s theory, each expert testified that the mechanism *1043 of the injury to the aorta was the abrupt deceleration which threw Mr. Langford forward. The aorta is bound by ligamen-tous tissue, both above and below the area of the injury. The abrupt deceleration caused the aorta, as well as the spine, to strain forward to the point of tearing.
A factfinder’s conclusions may not be set aside on appeal in the absence of manifest error or unless clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Smith v. Brookshire Grocery Co., 30,184 (La.App.2d Cir.1/23/98), 706 So.2d 643. Reversal of findings of fact on appeal requires that (1) the appellate court find from the record that no reasonable factual basis exists for the trial court’s finding, and (2) the appellate court determine that the record establishes the finding is clearly wrong or manifestly erroneous. /¿Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Elrod v. Wal-Mart Stores, Inc., 31,852 (La.App.2d Cir.5/7/99), 737 So.2d 208.
Presented with various medical theories and opinions, the jury unanimously found that Dr. Black did not commit medical malpractice in his treatment of Mr. Lang-ford. On this record, we cannot say that the jury was clearly wrong or manifestly erroneous.
|in Cause of Death
Plaintiffs assert that, because the autopsy report lists the primary cause of death as the aortic injury, Dr. Black’s failure to find and treat the aortic injury was medical malpractice and caused Mr. Lang-ford’s death. In the opinion of those experts who testified on behalf of Dr. Black, the cause of Mr. Langford’s death was not the aortic injury, but the ischaemic infarction and massive hemorrhaging of his small intestine. Having found that Dr. Black’s failure to locate the aortic injury was not medical malpractice, this argument is moot, but will be briefly discussed.
Dr. Tonya King, who actually performed the autopsy on Mr. Langford, had retired from pathology at the time of trial and was not called to testify by either party. Instead, each party hired other pathologists to interpret Dr. King’s report. Dr. David Werner and Dr. Richard Kamm were each qualified as experts in pathology on behalf of Plaintiffs.[5] In general, Dr. Kamm opined, and Dr. Werner postulated, that the cause of the ischaemic infarction of Mr. Langford’s small intestine and subsequent hemorrhage was the lack of blood flow to the small intestine due to the aortic injury, though they did not wholly agree on the arteries affected. In theory, the aortic injury was not initially severe enough to rupture, but only bled or leaked, causing a tamponade effect. In short, leakage of blood from the incomplete tear placed pressure around the aorta causing a diminished blood flow to the stomach, large intestine, small intestine and other organs. This diminished blood flow also meant diminished oxygen to those organs so that an ileus resulted and, eventually, necrosis or death of the tissue of the organs. In the small intestine, it appears that the protective lining necrosed and the other tissue of Inthe small intestine was exposed to the gastric fluids, which are highly corrosive. These gastric fluids deteriorated the remaining tissue causing massive hemorrhaging.
Dr. Yeager, Dr. Richardson and Dr. Beach disagreed with this theory and opined that the autopsy did not support it. All three doctors testified that the autopsy showed very little blood around the aortic injury, indicating that no hemorrhage or possible tamponation had occurred. In fact, Dr. Yeager testified that it would be very difficult to tamponade the aorta given the pressure and volume of blood flow. He had never seen it occur. None of these *1044 experts agreed that the hemorrhaging in the small intestine was in any way related to the aortic injury, stating it was not supported by the autopsy.
Dr. Werner did testify that the cause of 50 percent of small intestine ischaemic in-farctions is unknown. Dr. Yeager testified that there are four general causes of is-chaemic infarction of the small intestine. Basically, they are blockages of various types, be they clots or emboli, of the mes-enteric artery which supplies blood to the small intestine; and Mr. Langford did not suffer from any type of blockage.
Given the foregoing evidence, we find that the jury was correct in unanimously finding that Dr. Black did not commit medical malpractice. There is no evidence that Dr. Black’s treatment of Mr. Lang-ford fell below the standard of care because the aortic injury was not detected. In addition, even had Dr. Black somehow committed medical malpractice in not detecting the aortic injury, the evidence is clear that Mr. Langford did not die from the aortic injury.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. All costs are assessed to the Plaintiffs.
AFFIRMED.

. Ischaemia is a slate of low oxygen, usually due to obstruction of the arterial blood supply or inadequate blood flow leading to hypoxia in the tissue. Infarction is the resulting death of the tissue due to lack of oxygen.

. This upper extremity bilateral blood pressure differential, or a difference in the blood pressure between the left and right arms, is at the center of Plaintiffs' argument that the aortic injury should have been discovered and repaired. The expert testimony is conflicting as to whether the bilateral upper extremity blood pressure differential should have indicated the need for further testing by Dr. Black in the form of an aortogram to discover the aortic injury.

. The mediastinum is the space in the thoracic cavity behind the sternum and in between the two pleural sacs. If the aorta had been damaged and bleeding, the blood would have filled this cavity making it wider, which would be seen on x-ray.

. Dr. Black changed this testimony from his first deposition, in which he stated that a differential of 10 to 15 millimeters of mercury was significant, to a differential of 30 millimeters in his second deposition and, at trial, to a differential of 30 to 40 millimeters. Dr. Black pointed out at trial that,' in his first deposition, he qualified his answer by saying he would have to do some research to get an exact number which is why the number differed in his second deposition. He further stated that he was never able to find any research regarding trauma patients and, instead, used those numbers found concerning pediatric care, which were never definitive.

. Dr. Werner was initially contacted on behalf of Dr. Black to evaluate Dr. King’s autopsy report. When Dr. Black chose not to call Dr. Werner to testify, Plaintiffs retained him. During his testimony, Dr. Werner declined to actually give an opinion, but did “postulate” on a possible interpretation of the report.