793 So.2d 268 (2001)
Courtney WILSON and Maurice Frazier, Plaintiffs-Appellants,
v.
WINN PARISH MEDICAL CENTER and Julio Iglesias, M.D., Defendants-Appellees.
No. 34,882-CA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 2001.
*270 Rivers, Beck, Dalrymple & Ledet, by Joseph Dalrymple, Alexandria, Counsel for Appellants.
Brittain & Sylvester by Russell Sylvester, Natchitoches, Counsel for Appellee.
Before NORRIS, WILLIAMS and GASKINS, JJ.
GASKINS, J.
The plaintiff's in this medical malpractice suit appeal from a judgment in favor of the defendant, Dr. Julio Iglesias. The trial court found that the plaintiff's failed to prove that Dr. Iglesias' treatment of the decedent fell below the standard of care for a general surgeon. We affirm.

FACTS
The decedent, Jan Wilson, had a nearfatal heart attack in 1990. It took 45 minutes of emergency treatment by her physician, Dr. Mark Shelton, to resuscitate her. During the next two years, she saw Dr. Shelton periodically for various complaints such as epigastric pain and respiratory problems.
On September 5, 1993, Ms. Wilson, then age 41, complained to her mother of severe stomach pain. The next day, Labor Day, she went to Winn Parish Medical Center with complaints of severe abdominal pain, nausea and vomiting. Ms. Wilson was seen in the emergency room by Dr. Iglesias, a general surgeon, who found her abdomen to be soft and not distended. His initial diagnosis suggested a peptic ulcer. Ms. Wilson was admitted to the hospital under the care of her treating physician, Dr. Shelton, with Dr. Iglesias as the surgical consult. Her mother stayed with Ms. Wilson that night; she testified that her daughter constantly complained of agonizing pain and repeatedly begged for help. The pain medications given to her did little to reduce her discomfort.
At about 11:00 a.m. on September 7, Dr. Iglesias attempted to perform an endoscopy on Ms. Wilson. During the first portion of the test, blood-tinged fluid was observed in her duodenum. However, the procedure could not be completed because Ms. Wilson vomited; there was some question as to whether she aspirated. Additionally, she became severely hypoxic (the oxygen level in her blood dropped) and hypotensive (her blood pressure dropped).
Ms. Wilson was then admitted to ICU where the nurse initially reported active bowel sounds and no change in her abdomen. CT scans of her chest and abdomen ordered by Dr. Shelton earlier in the day were not performed because of the dramatic downturn in her condition following the endoscopy. No portable x-ray of the abdomen was ordered. Her white blood count, which had been 22,000 at about 1:30 a.m. on September 7th, plummeted to 2,200 by 3:00 p.m. that same day; the medical evidence indicates that this was most likely a sign of septic shock. By 11:00 p.m., a nurse noted that Ms. Wilson's *271 abdomen was round and firm and that no bowel sounds were heard. Due to her severe respiratory problems, she was intubated. Portable chest x-rays showed bilateral infiltrates; this was a significant change from the chest x-ray taken upon her admission 24 hours before which showed her lungs to be clear. Several possibilities were considered as the cause of her acute respiratory distress, including pulmonary embolism, aspiration pneumonia, and adult respiratory distress syndrome.
At about noon on September 8, 1993, Ms. Wilson was transported by helicopter to Willis-Knighton Hospital in Shreveport. There Dr. Paul Davis, a cardiologist, attempted to stabilize Ms. Wilson's condition, which was critical. Her abdomen was rigid, and there were no bowel sounds. After several hours of intensive treatment, it was felt that she was stable enough to undergo an exploratory laparotomy. However, she was so fragile that the surgery had to be performed while she was in a hospital bed because it was feared she could not survive being transferred to a surgical bed. Also, no general anesthesia was administered due to her extremely precarious condition. Surgery commenced at about 11:30 p.m. Ms. Wilson arrested as the first incision was made. Efforts to resuscitate her were unsuccessful, and she was pronounced dead shortly after midnight.
Cause of death was determined to be sepsis and multiple organ failure as the result of gangrenous changes in the bowel. Dr. William Norwood, the surgeon who operated on Ms. Wilson, was of the opinion that she may have had an infarct (or area of tissue death due to a local lack of oxygen) of the superior mesenteric artery, the main blood supply to the intestines. He stated that when he opened Ms. Wilson's abdomen, he determined that all of the small bowel and most of the large bowel were dead.
At the request of Ms. Wilson's 18-year-old daughter, Courtney Wilson, and her mother, Maurice Frazier, a medical review panel (MRP) was convened against Dr. Iglesias and Winn Parish Medical Center. A medical review panel found that neither the hospital nor the doctor fell below their respective standards of care. As to the hospital, the MRP noted that the hospital had no right to carry out procedures after the treating doctor canceled them due to the patient's deteriorating condition. As to Dr. Iglesias, the MRP found that he commenced diagnostic and medical procedures appropriately; the abdominal finding did not indicate surgical intervention or arteriography; the patient's death was not caused by the procedures followed or a lack of care; and none of the medical records or notes indicated a diagnosis of bowel infarction. The MRP concluded that faced with the patient's rapidly deteriorating condition, Dr. Iglesias acted appropriately in discontinuing diagnostic procedures and concentrating on stabilization.
Although suit was initially filed against Dr. Iglesias and Winn Parish Medical Center, the plaintiff's voluntarily dismissed the hospital from the suit in November 1997.[1] Following a bench trial on the claims against the remaining defendant, Dr. Iglesias, the trial judge rendered a written opinion in June 2000. The court found that the plaintiffs had failed to carry their burden of proving that Dr. Iglesias had breached the standard of care for a general *272 surgeon under the circumstances presented.
The plaintiffs appeal.

MANIFEST ERROR

Law
In a medical malpractice action, a plaintiff must establish the standard of care applicable to the charged physician, a violation of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's resulting injuries. La. R.S. 9:2794. Expert witnesses who are members of the medical profession are necessary sources in actions such as these to determine whether the defendant possessed the requisite degree of skill or knowledge or failed to exercise reasonable care and diligence. Demopulos v. Jackson, 33,560 (La.App.2d Cir.6/21/00), 765 So.2d 480.
A physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events. Simmons v. West, 29,633 (La.App.2d Cir.6/18/97), 697 So.2d 688, writ denied, 97-2308 (La.11/26/97), 703 So.2d 647; Langford v. Schumpert Medical Center, 33,311 (La.App.2d Cir.5/10/00), 759 So.2d 1037.
A factfinder's conclusions may not be set aside on appeal in the absence of manifest error or unless clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993). Reversal of findings of fact on appeal requires that (1) the appellate court find from the record that no reasonable factual basis exists for the trial court's finding, and (2) the appellate court determine that the record establishes the finding is clearly wrong or manifestly erroneous. Stobart, supra. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Simmons v. West, supra.
Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof are factual issues to be resolved by the trier of fact and will not be disturbed on appeal in the absence of manifest error. Simmons v. West, supra. As a matter of proper allocation of trial and appellate functions between the respective courts, the manifest error standard applies even when the evidence before the trier of fact consists solely of written reports, records, or depositions. Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La.1987); Shephard on Behalf of Shephard v. Scheeler, 96-1690 (La.10/21/97), 701 So.2d 1308.

Discussion
The plaintiffs contend that the trial court erred in its assessment of much of the medical evidence, particularly that pertaining to interpretation of Ms. Wilson's abdominal x-ray. Additionally, they assert that the trial court erred in accepting Dr. Iglesias' testimony that he examined Ms. Wilson frequently throughout her hospitalization and in finding that she had virtually no chance of survival even with quick surgical intervention. The gist of the plaintiffs' overall argument is that Dr. Iglesias did not properly assess Ms. Wilson for a "surgical abdomen" early in her hospitalization when a successful surgery could have been performed. However, the defense points to the failure of any of the doctors to testify that Dr. Iglesias breached the appropriate standard of care.

*273 Interpretation of abdominal x-rays

When Dr. Iglesias reviewed the abdominal x-rays taken when Ms. Wilson was admitted, he found them to be unremarkable and noted no significant air fluid levels. The subsequent report by a radiologist stated that doctor's impression that the x-rays presented a "non specific abdominal survey" and that "gas pattern is not unusual with no dilatation or acute type fluid levels." Dr. Dave McCullough Rayburn, a general surgeon who served on the MRP, stated that the x-ray did not show anything "obviously abnormal" and that the air on the bowel was a nonspecific finding. Dr. Shelton was of the same opinion.
However, Dr. Norwood interpreted the x-rays as abnormal with air fluid levels and dilated loops in the small bowel. He verified that an air fluid level is usually indicative of an ileus or a mechanical obstruction of the bowel. He also stated that while the x-ray, in conjunction with her other test results, might have raised his suspicions of a surgical abdomen, he could not say that it would have caused him to operate. Likewise, Dr. G.L. Hovnatanian, another general surgeon who served on the MRP, stated that the x-ray was pathological and not normal. While he testified that it would have alerted him that there was an intra-abdominal process going on, it would not have caused him to diagnose bowel infarction.
Given the contradictory evidence presented on this issue, we cannot say that the trier of fact erred in failing to find that Dr. Iglesias breached the standard of care based upon his alleged misinterpretation of Ms. Wilson's abdominal x-rays.

Examinations of patient
There is considerable question as to Dr. Iglesias' attentiveness to Ms. Wilson throughout her hospitalization at Winn Parish Medical Center, due in large part to his woefully inadequate documentation of treatment. The Winn Parish Medical Center medical records contain Dr. Iglesias' initial ER evaluation and his endoscopy report. However, the chart is totally devoid of any progress notes by Dr. Igelsias recounting visits to the patient or describing examinations of her abdomen. Furthermore, the nurseswhose responsibility it is to note a doctor's visitrecorded few of the numerous visits he claimed to have made to Ms. Wilson's bedside.[2] Ms. Wilson's mother testified that during her daughter's first day in the hospital, Dr. Iglesias came by her room twice but failed to examine or listen to Ms. Wilson's abdomen. (Both of these visits to Ms. Wilson were noted on her patient care record.) The nurses' notes indicate that Dr. Iglesias was notified of medication matters twice during the early morning hours of September 7th. Following the endoscopy, the ICU nurses charted only one visit at 4:30 p.m. by Dr. Iglesias; there was also notation *274 of a 7:30 p.m. telephone call but it is unclear as to whether the doctor initiated the call or was telephoned by the nurses.
Dr. Norwood testified that he personally had never treated a patient for three days without making a single progress note. He admitted that if the lack of notation of a clinical exam in fact meant that the doctor had failed to make such an exam, it would be malpractice. However, he acknowledged that sometimes doctors fail to make notes but communicate verbally with the other doctors and the patient's family.
Dr. Shelton conceded the inadequacy of Dr. Iglesias' charting, observing that his documentation was "not what we would like" and that Dr. Iglesias did not document what he probably should. He testified that he expected a surgical consult to do a hands-on exam of the abdomen, listening and observing, several times a day and that he would have expected those observations to be noted in some fashion.
However, we observe that in his progress notes, Dr. Shelton made references to consultations with Dr. Iglesias and Dr. Iglesias' visits to Ms. Wilson. For example, in a progress note dictated on the morning of September 7th, he stated that "Dr. Iglesias has checked her several times yesterday and last night." Later that day, he stated, "I reviewed the case again with Dr. Iglesias and discussed the possibilities." In his deposition, Dr. Shelton testified that although he could not specifically recall seeing Dr. Iglesias feel her abdomen, both he and Dr. Iglesias were checking Ms. Wilson very closely. According to Dr. Shelton, they were both "at her bedside, examining her and talking to her and trying to figure out what was going on." He had no concerns that Dr. Iglesias was not providing appropriate assessment of the patient. He testified that they were communicating about her condition and that they were in consultation after the endoscopy. Dr. Iglesias testified that they spoke three to four times per day about Ms. Wilson's condition. He also testified that he conducted exams of her abdomen throughout her hospitalization.
On matters of credibility, an appellate court is required to defer to the trier of fact. Although Dr. Sheltonlike most of the other physicians in this casetestified by deposition, that deference is still applicable. Furthermore, the trial court observed the demeanor of the witnesses who testified in court, including Dr. Iglesias, Nurse Peters and Nurse James. It is apparent that the trial court resolved the question of the adequacy and frequency of Dr. Iglesias' examination in his favor. Given the corroboration provided by Dr. Shelton and Nurse Peters, we cannot find manifest error on this issue.

Survivability
All of the doctors gave a pessimistic prognosis for a patient suffering ischemia (inadequate blood supply due to blockage of the blood vessels) to the bowel. Dr. Rayburn testified that it was an extremely difficult condition to diagnose and highly lethal with a mortality rate of almost 100 percent. According to him, if Ms. Wilson had survived, her lifestyle would have been severely altered due to the surgical removal of the dead intestines. He stated that a patient with such resected bowels would not be able to tolerate oral feedings and would require hyperalimentation. However, he had only encountered a few patients with bowel infarctions during his residency and none in his subsequent private practice.
Dr. Hovnatanian gave a mortality rate of more than 80 percent and stated that there was virtually no treatment for this condition. If the damage to the intestines was extensive, death would invariably follow. However, if not extensive and resection of the bowel was possible, the patient *275 would then be subjected to a "dismal" quality of life because most survivors require IV pump feeding. Dr. Hovnatanian stated that most patients who initially survived would soon die of malnutrition or recurrent medical problems like pneumonia or kidney infection. Of the two patients he had been able to save under these circumstances, one died two hours after surgery while the other lingered for six months. He testified that there is no way of knowing whether surgery would have done Ms. Wilson any good at all.
Dr. Norwood stated that he saw the condition two to four times per year and that, with prompt surgical intervention, his survival rate for patients was 50 percent. Afterwards, the survivors' quality of life depended on their prior quality of life and the amount of bowel that had to be removed. In the instant case, he could not determine if the situation was salvageable.
Given the conflicting evidence as to the percentages of survivability, we cannot find that the trial court erred in finding that the plaintiffs had not carried their burden of proof.

Transfer to another hospital
The plaintiffs contend that the trial court erred in not specifically addressing their contention that Ms. Wilson should have been transferred to another facility at an earlier point in time. Dr. Hovnatanian stated that until the hypotension and hypoxia set in after the endoscopy, there was no reason to transfer the patient. Likewise, Dr. Rayburn did not feel that transfer was inappropriately delayed. We agree. Our review of the record reveals that, prior to the endoscopy, appropriate diagnostic procedures to evaluate Ms. Wilson's condition were ongoing at Winn Parish Medical Center. After the endoscopy, transfer to another hospital was not a viable option until she could be stabilized.

CONCLUSION
In summary, the plaintiffs did not present any expert witness who testified that Dr. Iglesias violated his standard of care. While some factual issues were litigated that could have been indicative of a breach, evidence was introduced that supported the trial court's finding of fact that Dr. Iglesias did not violate the standard of care. Our court is mandated not to disturb the trial court's findings on credibility and factual issues unless there is manifest error. Finding none, we affirm.
The judgment of the trial court is affirmed. Costs are assessed against the plaintiffs.
AFFIRMED.
NOTES
[1] While the decedent's daughter sought wrongful death and survival damages, her mother sought Lejeune damages as a result of watching Ms. Wilson's suffering at Winn Parish Medical Center.
[2] Allen Peters, the nurse who cared for Ms. Wilson during most of her ICU stay, testified that he does not note every time a doctor examines a patient and that he was not sure whether such documentation was hospital policy. (At the time of Ms. Wilson's hospitalization, Nurse Peters was a recent nursing school graduate.) However, he testified that he particularly recalled Ms. Wilson because she was the first patient he ever had to extubate herself and that he specifically recalled both Drs. Shelton and Iglesias examining her. Sharon James, a veteran nurse who also cared for Ms. Wilson in ICU, testified that she was taught to always chart a doctor's visit and that she had never intentionally failed to chart a doctor's visit. She charted frequent telephone contact with Dr. Shelton and several visits to Ms. Wilson by Dr. Shelton but only one visit by Dr. Igelsias on the 7th and none on the 8th. Also, Ms. Wilson's sister, a nurse who formerly worked at Winn Parish Medical Center, testified that a nurse is supposed to chart all doctors' visits; however, she admitted that nurses did not always know when doctors visited patients.