799 So.2d 671 (2001)
Nellie Geneva Jinks JOHNSTON, et al., Plaintiffs-Appellants,
v.
ST. FRANCIS MEDICAL CENTER, INC., et al., Defendants-Appellees.
No. 35,236-CA.
Court of Appeal of Louisiana, Second Circuit.
October 31, 2001.
*672 Boggs & Thompson by A. Michael Boggs, Bossier City, Counsel for Appellants.
Onebane, Bernard, Torian, Diaz, McNamara & Abell by William E. Bourgeois, Monroe, Counsel for Appellee, Dr. Joel Eldridge.
Crawford & Anzelmo by Donald J. Anzelmo, Monroe, Counsel for Appellee, Dr. John Price.
Before STEWART, PEATROSS and KOSTELKA, JJ.
STEWART, J.
In this medical malpractice action, the jury found in favor of the defendants, Dr. John Price and Dr. Joel Eldridge. Accordingly, the trial court rendered a judgment dismissing the claims of the plaintiffs, the wife and children of the deceased, Emmette Johnston. The plaintiffs now appeal. For the reasons set forth below, we affirm.

FACTS
Emmette Johnston, a 79 year old male, presented to the emergency room of Union *673 General Hospital ("Union General") in Farmerville, Louisiana, during the early evening of July 30, 1996, with complaints of right lower quadrant abdominal pain. He was examined by Dr. Paul Malabanan, who diagnosed "acute abdomen" and suspected the possibility of appendicitis. Malabanan's examination revealed symptoms of tenderness in the right lower quadrant of the abdomen, rebound tenderness in the same area, a positive psoas sign, and sluggish bowel sounds. The records of Union General note that Johnston was passing a lot of flatulence with a very foul odor. Abdominal x-rays were taken. Johnston's blood pressure at the time of his discharge from Union General was 121/74.
Johnston was transferred by ambulance to St. Francis Medical Center ("St.Francis") in Monroe where he was to be under the care of Dr. John Price, a general surgeon. While en route to St. Francis, Johnston's blood pressure ranged from 120/74 to 122/70. The records from Union General, including the x-rays and lab results, were transferred with Johnston to St. Francis.
Upon his arrival at St. Francis, Johnston was examined in the emergency room by Dr. Eldridge at the request of Dr. Price. The patient history taken by Dr. Eldridge notes that Johnston's symptoms began during the afternoon and that he experienced some vomiting and diarrhea. The physical examination established a blood pressure of 92/60. Johnston's abdomen was soft and mildly distended. Mild tenderness was noted in the right lower quadrant and right upper quadrant. The abdomen was also "mildly tympanic to percussion." There were scattered bowel sounds. The patient was found to be in no acute distress. Lab work taken at Union General was reviewed, and additional lab work was performed. An elevated level of amylase, a pancreatic enzyme, was noted. Dr. Eldridge's impression was that Johnston was experiencing abdominal pain with nausea, vomiting, and diarrhea by history. After Dr. Eldridge reported this information to Dr. Price, Johnston was admitted to a room. The report compiled by Dr. Eldridge does not mention his review of the abdominal x-ray from Union General. However, Dr. Eldridge's trial testimony establishes that he did review the x-ray, but noted nothing abnormal. Johnston remained in Dr. Eldridge's care for over three hours, during which time his condition remained stable. Additional lab work was performed at 3:45 a.m. that night.
At approximately 7:00 a.m. the next morning, Dr. Price examined Johnston. His history notes that Johnston had an acute onset of right-sided abdominal pain, followed by nausea and frequent diarrhea, and that cramping abdominal pain had continued since that time. The physical examination established a blood pressure of 140/70. Dr. Price noted that Johnston appeared to be in "mild distress" and to have a "washed out appearance." Johnston's abdomen was soft with tenderness in the right lower quadrant and the epigastrium. Active bowel sounds were noted to be present. Laboratory tests appeared normal except for elevated BUN, creatinine, and amylase levels. Dr. Price's impression was that the symptoms and lab studies presented an "unclear picture." His differential diagnosis included appendicitis, pancreatitis, ischemic bowel, viral or bacterial gastroenteritis, or diverticulitis. He ordered a gallbladder ultrasound, a CAT scan of the abdomen, and a stool culture. His orders further indicated that he would consult a gastroenterologist for a possible colonoscopy or other diagnostic studies as might be indicated. Following his examination of Johnston, Dr. Price left St. Francis to perform surgery at another hospital.
*674 During the morning, Johnston's condition worsened. At 8:00 a.m., Diane Davis, a registered nurse, noted Johnston's blood pressure to be 106/65. His abdomen was tender, and there were no bowel sounds. His IV had become dislodged and attempts to restart it throughout the morning were unsuccessful. By 10:30 a.m., Johnston's blood pressure was down to 81/44, and he was exhibiting "shocky symptoms." Efforts to page Dr. Price began. During the next half-hour, Johnston's blood pressure fluctuated, with recorded readings of 85/52, 115/61, and 92/56. Once Dr. Price learned of Johnston's condition, he ordered him transferred to ICU. He also ordered placement of a central IV line. This transfer was accomplished by 11:15 a.m.
Dr. Ronald Hammett treated Johnston upon his transfer to ICU. As per his report, he found Johnston to be "in severe abdominal pain, hypotensive, and somewhat tachycardiac." Blood pressure was 90/100. Dr. Hammett's physical examination of Johnston revealed a distended abdomen that was markedly tender in the right lower quadrant and right flank areas. The was also definite fullness in the right side of the abdomen. Bowel sounds were diminished. BUN and creatinine levels were elevated. Dr. Hammett reviewed the x-rays taken the night before and noted the possible presence of an abdominal aortic aneurysm. Dr. Hammett's impression was that Johnston was experiencing a "dissecting abdominal aortic aneurysm." This impression was based on the acute onset of Johnston's symptoms, his hypotensive condition, and the elevated BUN and creatinine levels which were suggestive of intravascular volume depletion process. Dr. Hammett placed a central IV line, as per Dr. Price's orders. At 12:05 p.m., Johnston coded and resuscitation efforts began.
Resuscitation efforts continued for almost an hour before a pulse was obtained. In the meantime, Dr. Price had arrived at the hospital. Johnston was taken to the operating room to undergo an exploratory abdominal surgery. He was found to have a ruptured abdominal aortic aneurysm. While surgical repair of the ruptured aneurysm was underway, Johnston died on the operating table.
Johnston's family, his wife and three children, filed suit against St. Francis, Dr. Price, and Dr. Eldridge after the medical review panel rendered a decision finding no failure on the part of the defendants to meet the standard of care. The matter proceeded to a jury trial of the plaintiffs' claims against Dr. Eldridge and Dr. Price. The plaintiffs alleged that these defendants were negligent in their failure to diagnose the abdominal aortic aneurysm, which was visible on the x-ray taken at Union General and which was indicated by the symptoms and lab results. After listening to the testimony of a number of experts, including the defendants, the jury resolved the matter in favor of the defendants. The trial court then rendered judgment in favor of the defendants and denied a motion for judgment notwithstanding the verdict ("JNOV") and/or new trial made by the plaintiffs. Thereafter the plaintiffs appealed, assigning as error the jury's failure to find that the treatment rendered by Dr. Eldridge and Dr. Price fell below the standard of care, the jury's failure to award damages, and the trial court's failure to grant the motion for JNOV and/or new trial. Our discussion will be limited to the first assignment, as resolution of that issue pretermits discussion of the remaining assignments of error.

DISCUSSION

Applicable Law
In a medical malpractice action against a physician, the plaintiff must prove the applicable standard of care, a *675 violation of the standard of care, and a causal connection between the alleged negligence and the resulting injuries. La. R.S. 9:2794; Wilson v. Winn Parish Medical Center, 34,882 (La.App.2d Cir.6/20/01), 793 So.2d 268. A physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised, and not on the basis of hindsight or in light of subsequent events. Wilson v. Winn Parish Medical Center, supra; Langford v. Schumpert Medical Center, 33,311 (La. App.2d Cir.5/10/00), 759 So.2d 1037; Simmons v. West, 29,633 (La.App.2d Cir.6/18/97), 697 So.2d 688, writ denied, 97-2308 (La.11/26/97), 703 So.2d 647. In a medical malpractice action, opinions of expert witnesses who are members of the medical profession are necessary to determine whether the defendant possessed the requisite degree of knowledge or skill, or failed to exercise reasonable care and diligence. Wilson v. Winn Parish Medical Center, supra; Demopulos v. Jackson, 33,560 (La.App.2d Cir.6/21/00), 765 So.2d 480; Hinson v. Glen Oak Retirement Home, 34,281 (La.App.2d Cir.12/15/00), 774 So.2d 1134.
It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). The conclusions of the trier of fact may not be set aside on appeal in the absence of manifest error or unless clearly wrong. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993). Reversal of findings of fact on appeal requires that (1) the appellate court find from the record that no reasonable factual basis exists for the trial court's findings, and (2) the appellate court determines that the record establishes that the findings are clearly wrong or manifestly erroneous. Id. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).

Analysis-Loss Chance of Survival
The plaintiffs argue that the evidence clearly establishes that Johnston had an abdominal aortic aneurysm upon his arrival at St. Francis and that had his condition been diagnosed and treated earlier, he would have had an increased chance of survival. They further argue that the jury did not address whether the treatment provided by Dr. Eldridge and Dr. Price fell below the standard of care applicable to each, but instead determined, contrary to the great weight of the evidence, that Johnston did not lose a chance of survival. The plaintiffs base this argument on the jury interrogatory. However, no objection was raised to the language of the interrogatory.
In answering the interrogatory, the jury was first required to answer the following inquiry:
1. Have the plaintiffs proved that William Emmette Johnston lost a chance of survival that he otherwise might have had due to a failure to properly diagnose and treat his abdominal aortic aneurysm?
If your answer to Question No. 1 is No, please stop and return to the courtroom. If your answer is yes, please proceed to answer Question No. 2.
The interrogatories included in the record show that the jury answered "no" by a vote of 11 to 1. Plaintiffs argue that this first inquiry pertains only to a loss of a chance of survival and that by answering "no" to this first question, the jury did *676 not consider whether the defendants were negligent in failing to diagnose Johnston's condition. However, we note that the language of the first inquiry clearly refers to a loss of a chance of survival due to a failure to properly diagnose and treat the abdominal aneurysm. To answer this inquiry, the jury had to necessarily consider whether there was a failure to diagnose and treat which led to the loss of a chance of survival. The jury did not have to consider only whether Johnston lost a chance of survival. While the evidence does establish that Johnston would have had an increased chance of survival had the aneurysm been detected earlier and surgery begun before he coded, this evidence alone does not establish negligence on the part of Dr. Eldridge or Dr. Price in his treatment of Johnston. The remaining inquiries on the interrogatory ask whether each individual defendant fell below the standard of care in their treatment of Johnston. There was no need to answer these inquiries once the jury determined that there was no loss of a chance of survival due to a failure to properly diagnose and treat the abdominal aortic aneurysm.[1] However, we will proceed to review the evidence to determine whether it was manifestly erroneous for the jury to find that the defendants did not fail to properly diagnose and treat the aneurysm.

Negligence of Drs. Eldridge and Price
The plaintiffs' claim against Dr. Eldridge is based on his failure to diagnose the aneurysm after viewing the x-ray taken at Union General. Their claim against Dr. Price is based on his failure to view the x-ray from Union General when he saw Johnston on the morning of July 31, 1996, and his failure to include abdominal aortic aneurysm in his differential diagnosis. Resolution of the issues presented regarding the care rendered by Dr. Eldridge and Dr. Price requires expert opinion. Thus, we will review the opinions given in this matter, including those of the defendants.
Dr. Eldridge was the emergency room physician on duty when Johnston arrived at St. Francis. Dr. Price asked Dr. Eldridge to see Johnston upon his arrival at St. Francis' emergency room. Johnston presented with a diagnosis of "acute abdomen" made by Dr. Malabanan at Union General. Dr. Eldridge testified that "acute abdomen" is not a particular diagnosis; instead, it refers to a coalition of symptoms indicating a problem in the abdominal area. Dr. Eldridge also testified that the standard of care would require him to evaluate the patient's particular complaints in light of the physical exam and any diagnostic studies in order to rule out any diagnosis, particularly life-threatening conditions, consistent with the presenting symptoms.
In accordance with this standard of care, Dr. Eldridge reviewed the records from Union General, including the abdominal x-ray taken there, in conjunction with his examination of Johnston. Dr. Eldridge explained that he viewed the x-ray for approximately three to five minutes and that he did not see the calcification on it. He testified that even if he had noted the calcification, he may not have interpreted it to be an aneurysm. He further testified that he was looking at the x-ray for indication of a gastrointestinal problem, such as a gas pattern or obstruction, that would be consistent with symptoms of abdominal pain with a history of nausea, vomiting, and diarrhea. Dr. Eldridge did not feel it *677 was necessary to call a radiologist to interpret the x-ray that night. No radiologist was on duty. Moreover, he believed that he was as competent as any emergency room physician to examine the x-ray film for signs of gastrointestinal problems. Dr. Eldridge did not consider aneurysm as a likely diagnosis even though it is a condition more common among the aging population. He stated that most patients with aneurysm present to the emergency room in an "extremist state" and complain of excruciating back pain as opposed to abdominal pain. Dr. Eldridge spent over three hours with Johnston, during which time Johnston remained alert, oriented, and not in any acute distress. He found Johnston to be stable for admission to the hospital and in need of further evaluation, but not in need of immediate surgical intervention. He advised Dr. Price of his findings by telephone, and Johnston was admitted to a room. Upon admission, he was no longer in the care of Dr. Eldridge.
Dr. Price is the general surgeon to whom Johnston was sent by Dr. Malabanan for consultation. Dr. Price described the term "acute abdomen" used by Dr. Malabanan as a "very general expression." Dr. Price described the standard of care as requiring him to examine the patient, to order appropriate lab work, and to come up with a differential diagnosis that covers the most likely conditions given the exam and patient's history. He testified that this standard would not necessarily require him to have reviewed the x-ray taken at Union General. Moreover, Dr. Price testified that he was not aware that such an x-ray was available when he examined Johnston. Even if he had known of the x-ray and reviewed it, he could not say that he would have changed his course of treatment. Dr. Price testified that because Johnston was complaining of right lower quadrant abdominal pain, he would have been looking at the x-ray for bowel gas patterns and air fluid levels suggestive of gastrointestinal disorders. He could not say that he would have even seen the calcification, which he described as pretty hard to see on the x-ray film.
The differential diagnosis developed by Dr. Price after his examination of Johnston included appendicitis, pancreatitis, ischemic bowel, gastroenteritis, and diverticulitis. Dr. Price believed that Johnston's symptoms presented an unclear picture, but one that pointed to some sort of gastrointestinal problem. He did not include aneurysm because he did not believe that it fit the patient's condition and symptoms. However, he also did not rule out any conditions. The additional laboratory tests, the CAT scan, the gallbladder ultrasound, and the gastroenterology consult ordered by Dr. Price after his examination of Johnston were intended to rule out conditions in the differential diagnosis.
Johnston's condition worsened before the diagnostic studies ordered by Dr. Price could be done. Johnston was transferred to ICU where he was treated by Dr. Ronald F. Hammett, a specialist in internal medicine and pulmonary medicine. Dr. Hammett diagnosed Johnston's condition as a ruptured abdominal aortic aneurysm. Dr. Hammett made it clear in his testimony that his diagnosis was based on Johnston's condition at the time he saw him. His review of the records from Union General occurred retrospectively. He could not state that Johnston had an acute abdomen or surgical emergency at any time prior to when he treated him. Dr. Hammett noted that Johnston's complaint of abdominal pain in the right lower quadrant presented an atypical pain pattern for an aneurysm, which typically involves pain radiating from the mid-abdomen to the back. However, he opined that a differential diagnosis, meaning a list of what the patient's problem could be, should include *678 aneurysm. Dr. Hammett clarified that a differential diagnosis need not include every conceivable condition; rather, it should include only the most likely, including life-threatening conditions. With regard to the x-ray taken at Union General, Dr. Hammett testified that the rim of calcification from which the aneurysm is identified is easy to see if looking for it, but could be missed if the physician is not looking for it. Dr. Hammett did not specifically testify that either Dr. Eldridge or Dr. Price failed to meet the standard of care in their treatment of Johnston.
Dr. William T. Ferguson, a general surgeon who served as a member of the medical review panel in this matter, was called by the plaintiffs to testify. However, he testified that neither Dr. Eldridge nor Dr. Price breached the standard of care, which he explained requires physicians to rule out all life threatening conditions indicated by the patient's symptoms. He described a differential diagnosis as including the most common conditions associated with the particular symptoms presented by the patient. Moreover, he agreed that the standard of care would not require a physician to rule out life-threatening conditions that do not appear to be consistent with the patient's symptoms and complaints. In this instance, Dr. Ferguson believed that Johnston presented with classic symptoms of a gastrointestinal problem. Dr. Ferguson had never had a patient with an abdominal aortic aneurysm present with complaints of right lower quadrant abdominal pain. He believed that Dr. Price did everything he could to analyze the clinical picture presented, including ordering appropriate studies. In viewing the abdominal x-ray, Dr. Ferguson noticed the small rim of calcification but could not say whether it was an aneurysm or a tortuous (curved) aorta. He did not fault Dr. Eldridge for not seeing the calcification, especially in light of the clinical picture presented by Johnston's symptoms and complaints which did not point to a leaking aneurysm. Also, he did not fault Dr. Price for not viewing the x-ray when he examined Johnston on the morning of July 31, 1996. He believed that Dr. Price's management of the case would not have changed at that time and that he ordered appropriate tests to come up with a diagnosis.
Dr. Steven Keith Home, an emergency medicine physician who also served on the medical review panel, was called to testify by the plaintiffs with regard to the treatment rendered by Dr. Eldridge. However, he found no breach of the standard of care by Dr. Eldridge. Dr. Horne testified that Johnston's clinical presentation, which included right lower quadrant abdominal pain and a history of nausea, vomiting, and diarrhea, was not indicative of a massively leaking aneurysm. He believed that Dr. Eldridge did an appropriate assessment of the patient. Additionally, he did not believe that he could have diagnosed an aneurysm from the x-ray.
Dr. Steve W. Pate, a radiologist who dictated the x-ray after the fact, testified that the faint rim of calcification shown on the x-ray could be seen upon close scrutiny. While noting that the calcification is suggestive of an aneurysm, Dr. Pate stated an ultrasound or scan would have had to have been done to verify the presence of an aneurysm. Moreover, the x-ray would not indicate whether the aneurysm was leaking or ruptured. He also noted that the standard of care would be different for a radiologist reading the x-ray as compared to another physician.
The plaintiffs also presented the testimony of Dr. R. Mark Hoyle, who qualified as an expert in general surgery. According to Dr. Hoyle, the problem with the case was the failure of the emergency *679 room physicians, Dr. Malabanan and Dr. Eldridge, to either see the calcification on the x-ray or to place any significance on it. Dr. Hoyle testified that he could not fault anyone for not seeing the calcification on the x-ray. However, he would fault a physician for seeing it but failing to note its significance. He testified that Dr. Eldridge had a duty to read the x-ray to the best of his ability. If he did so and did not see the calcification, then he would not find him at fault. If he did see the calcification but did not note the significance of it, then he would be at fault. Dr. Hoyle did not find that Dr. Price breached the standard of care in his treatment of Johnston even though he did not view the x-ray. He noted that Dr. Price was not aware of the x-ray. He also noted that even if Dr. Price had been aware of the x-ray, he may not have viewed it since he ordered a CAT scan to be done that morning. Dr. Hoyle, too, did not find that Johnston's symptoms fit the classic clinical presentation of an abdominal aortic aneurysm.
Finally, the plaintiffs presented the testimony of Dr. Robert V. West, III, who qualified as an expert in emergency room treatment. Dr. West practices law as well as medicine. According to Dr. West, the standard of care for an emergency physician requires the physician to interpret available data in a reasonable fashion and apply this to the clinical situation presented. Here, he believed that Dr. Eldridge failed to meet the standard of care because he did not exclude the possibility of an aneurysm when examining Johnston in the emergency room. Dr. West believed that symptoms of abdominal pain, falling blood pressure, falling red blood cell count, and the x-ray were indicative of bleeding and that no one took steps to determine whether Johnston was in fact suffering from a ruptured aneurysm. Dr. West also opined that the same standard of care would apply to Dr. Price, and he faulted Dr. Price for not looking at the x-ray and lab work when he examined Johnston. Finally, Dr. West testified that the differential diagnosis for a patient with an acute abdomen should include aneurysm. He believed that Dr. Price breached the standard of care in failing to include this potentially life threatening condition in his differential diagnosis.
Two expert witnesses were called to testify on behalf of the defendants. The first was Dr. Frederick Barnett Carlton, Jr., an emergency room physician. Dr. Carlton concluded that Dr. Eldridge did not breach the standard of care. He described the abdominal aortic aneurysm suffered by Johnston as an uncommon disease presenting in an atypical manner. He did not find it reasonable to consider this condition in a patient presenting with right lower quadrant abdominal pain and a history of nausea, vomiting, diarrhea, and flatulence. With regard to the x-ray, he stated that the calcification was noticeable, but he could not say that he would have seen it if he did not already know about it. He explained that the x-ray would have been examined with certain problems in mind; here, those were gastrointestinal problems which would lead a physician to look for bowel gas patterns. Moreover, Dr. Carlton testified that even if Dr. Eldridge saw the calcification and did not find it significant, this would not be below the standard of care due to the clinical picture presented. Dr. Carlton believed that the outcome in this case was unfortunate but "totally understandable." He also believed that Johnston received reasonable, though not excellent, healthcare and noted that a less than desirable outcome does not translate to bad healthcare.
Dr. Lester Wayne Johnson, a general surgeon, also testified on behalf of the defendants, particularly Dr. Price. Dr. Johnson described a differential diagnosis *680 as a working diagnosis which includes common conditions that would go along with the patient's history and examination. He believed that Dr. Price's differential diagnosis was reasonable, especially since the symptoms, including the unexplained elevation of amylase, were suggestive of pancreatitis. Dr. Johnson also noted that just because aneurysm was not written on Dr. Price's list does not mean that the condition was not under consideration. Furthermore, Dr. Johnson testified that Dr. Price met the standard of care for a general surgeon in that he assessed the patient and acted reasonably based on the assessment. Dr. Price evaluated the patient, came up with a list of the most likely ailments, and was gathering information to pin down the diagnosis.
Summation of the expert testimony presented at trial shows that the jury had to evaluate conflicting opinions as to whether Dr. Eldridge or Dr. Price breached the standard of care. Only one expert, Dr. West, unequivocally testified that the defendants breached the standard of care. Although the testimony of the other experts included some criticism of the care rendered by the defendants, the preponderance of the evidence was that no breach in the standard of care occurred. Johnston's symptoms, fluctuating blood pressure, and lab studies presented an unclear clinical picture at the time the events leading up to his death unfolded. Both Dr. Eldridge and Dr. Price believed that Johnston was suffering from some sort of gastrointestinal problem. However, no diagnosis had yet been made or ruled out at the time that Johnston went into shock. Additional diagnostic studies were underway to pinpoint Johnston's ailment. The record suggests that even if either Dr. Eldridge or Dr. Price had noted the calcification on the x-ray from Union General, additional studies, such as a CAT scan, would have been required to diagnose the aneurysm and determine whether it had ruptured. While the benefit of hindsight allows the experts to now see clearly from the x-ray and lab studies that Johnston's symptoms were caused by a bleeding abdominal aortic aneurysm, hindsight cannot form the basis for evaluating the conduct and judgment of the treating physicians at the time their professional judgment was exercised. Our review of the record shows a reasonable factual basis for the jury's finding in favor of the defendants. We cannot say that the jury was either manifestly erroneous or clearly wrong.

CONCLUSION
For the reasons expressed, the judgment of the trial court is affirmed at appellants' cost.
AFFIRMED.
NOTES
[1] Review of the jury interrogatories shows that four of the jurors did proceed to answer the entire interrogatory, thus indicating that the jury did consider the entirety of the issues before them, including whether the defendants' treatment fell below the standard of care.