870 So.2d 467 (2004)
In re MEDICAL REVIEW PANEL FOR the CLAIM OF GERTRUDE YOUNG, Plaintiff-Appellant
v.
BERNICE COMMUNITY REHABILITATION HOSPITAL, et al, Defendants-Appellees.
No. 38,402-CA.
Court of Appeal of Louisiana, Second Circuit.
April 7, 2004.
Rehearing Denied May 6, 2004.
*468 Rickey K. Swift, for Appellant Gertrude Young.
Mayer, Smith & Roberts, by Paul R. Mayer, Jr., Shreveport, Steven E. Soileau, for Appellees Continental Casualty Co. and Bernice Community Rehabilitation Hospital.
Before STEWART, PEATROSS and LOLLEY, JJ.
STEWART, J.
The plaintiff, Gertrude Young, appeals a judgment dismissing her medical malpractice claim against Bernice Community Rehabilitation Hospital ("BCRH") and its insurer, Continental Casualty Company. The judgment of dismissal was rendered in accordance with a jury verdict finding no negligence on the part of BCRH in its treatment of Young. Under the facts of this case, we find manifest error in the jury's negligence determination, and we reverse the trial court's judgment.

FACTS
Gertrude Young, then age 71, was a patient at BCRH from August 14, 2000 to October 3, 2000. She entered BCRH with significant health problems, including obesity, hypertension, diabetes, general debility, and post-polio syndrome. Young's left leg was amputated above the knee, and her right leg was significantly weakened due to post-polio syndrome. Young sought *469 rehabilitation in order to strengthen herself and become more self-sufficient.
On October 2, 2000, the day before her discharge from BCRH, Young sustained a nondisplaced tibial plateau fracture just below her right knee joint. Just prior to the incident, Young had left her room and was wheeling herself to BCRH's activity room. Her route took her in front of the "weight room" where patients were weighed. Barbara Polk, the director of nursing, was in the weight room with a representative from a scale company who was there to determine whether the scale was functioning properly. Polk saw Young in the hallway and asked whether she would allow herself to be weighed in order to check the scale. Young agreed to be weighed. She entered the weight room and was physically lifted from her chair into the chair used for weighing the patients. After weighing, Young went to the hallway to transfer back to her own wheelchair. A slide board was brought from her room, the two chairs were placed side by side, and Young transferred from one chair to another with the assistance of Polk and LaQuana Bailey, a certified nursing assistant.
Accounts differ as to when and how the injury to Young occurred. Young claims that her right foot slipped out in the middle of sliding over from one chair to the other. She heard a pop and felt "very excruciating pain." She claims that she was wearing an ordinary white sock on her foot. Both Bailey and Polk were holding her from behind with Polk to her left back and Bailey to her right back. Though there was some testimony from Young that the left brake of her wheelchair did not lock properly, she also testified that the wheelchair did not move during the transfer.
Polk testified that Young wanted to do the transfer herself rather than have someone physically place her back into her own wheelchair. Therefore, they went into the hallway where there was more room for the wheelchairs to be placed side by side for the transfer. Polk claims that she locked the wheels and stood with one foot in front of the front wheel and one foot behind the rear wheel. Her hands were on Young's left hip to assist her over to the other chair. Polk did not see Young's foot slip. Once Young went across the slide board into her chair, Polk turned around to speak with the scale company representative. She then heard Young say that she was hurt. Polk turned around and saw that Young's leg was hyperextended. Polk admitted that she neither checked nor noticed Young's footwear when the transfer was done.
LaQuana Bailey also assisted Young with the transfer. Bailey observed that Young was wearing a sock, and she described the sock as a "booty sock" with rubber grips underneath. Bailey claimed that Young wanted to do the transfer herself using the sliding board and that Young did these transfers about four to five times a day. Bailey explained that Young used her arms to help with the transfer and that she used her leg to then push back into her chair. Bailey testified that Young's foot did not slip during the transfer between chairs. Rather, Bailey testified that she saw Young's foot slip when she used her knee to push herself to the back of her chair. Young denied using her right leg to push herself back into the chair. She claimed she does not do this due to her weight.
Young filed suit against BCRH after a medical review panel rendered an opinion in favor of BCRH. Young alleged that BCRH's employees failed to follow standard transfer procedures, particularly since the transfer was done on a slick, tile surface, and failed to stabilize her leg or *470 block her foot to prevent it from slipping or sliding forward during the transfer. At trial, Young introduced and relied on a list of safety rules for transferring, which she asserted to be the standards that should have been followed. The pertinent rule states, "Make sure the patient has footwear that will not slip on the floor." BCRH presented testimony from two members of the medical review panel, both of whom testified that the transfer was done appropriately and met the standard of care. The jury concluded that there was no negligence on the part of BCRH in its treatment of Young. Thereafter, the trial court rendered a judgment dismissing Young's claim. This appeal by Young followed.

DISCUSSION
Unless a jury's factual findings are manifestly erroneous or clearly wrong, such findings may not be set aside on appeal. Rosell v. ESCO, 549 So.2d 840 (La.1989). Reversal of the fact-finder's determinations requires the appellate court to find that no reasonable factual basis exists for the findings and that the record establishes the findings to be clearly wrong or manifestly erroneous. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993). The issue to be resolved on appeal is not whether the trier of fact was right or wrong, but whether the conclusion was a reasonable one. Id. Where conflict exists in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Id.
A hospital is responsible for the negligence of its nurses or other medical personnel through the doctrine of respondeat superior. Hinson v. Glen Oak Retirement System, 37,550 (La.App.2d Cir.8/20/03), 853 So.2d 726, writ denied, 2003-2835 (La.12/19/03), 861 So.2d 572. In a medical malpractice action against a hospital, the plaintiff is required to prove, as in any negligence action, that the defendant owed a duty to the plaintiff to protect against the risk involved, that the defendant breached this duty, and that the breach caused the injury. Smith v. State, through Dept. of Health and Human Resources, 523 So.2d 815 (La.1988); Bellard v. Willis Knighton Medical Center, 34,360 (La.App.2d Cir.5/09/01), 786 So.2d 218, writ denied, 01-1686 (La.9/21/01), 797 So.2d 676. The mere occurrence of an injury or accident, alone, does not raise a presumption of negligence on the part of the hospital. Galloway v. Baton Rouge Gen. Hospital, 602 So.2d 1003 (La.1992).
A hospital is bound to exercise the degree of care toward a patient that his or her condition requires and to protect the patient from external circumstances peculiarly within the hospital's control. The determination of whether a hospital breached the duty of care owed a patient depends on the facts and circumstances of each particular case. Hunt v. Bogalusa. Community Medical Center, 303 So.2d 745 (La.1974); Borne v. St. Francis Medical Center, 26,940 (La.App.2d Cir.5/10/95), 655 So.2d 597, writ denied, 95-1403 (La.9/15/95), 660 So.2d 453. Great deference is due the jury's findings when medical experts express different opinions as to whether the standard of care was met. Hunter v. Bossier Medical Center, 31,026 (La.App.2d Cir.9/25/98), 718 So.2d 636.
Young argues that the jury's verdict is manifestly erroneous because there was unrebutted testimony establishing that BCRH's employees, Polk and Bailey, failed to follow the hospital's safety guidelines when transferring her from the "weight room" wheelchair to her own wheelchair. Young contends that the evidence establishes that Polk and Bailey failed to make sure that she was wearing non-slip footwear *471 before conducting the transfer on a slippery tile surface.
BCRH contends that the evidence supports the jury's verdict. The evidence shows that Young was wearing a non-slip sock, that she performed the same type of transfer on the same surface at least four to five times a day, and that the transfer and actions of BCRH's employees met the standard of care. BCRH also argues that the safety rules relied on by Young apply only in the gym and have no application in the hospital setting. Moreover, BCRH contends that the injury did not occur until after the transfer when Young was attempting to push herself back into the seat of her chair by pushing down with her leg.
Young introduced into evidence a list of safety rules for transferring patients. These rules are for the protection and safety of both the patient and anyone assisting with the transfer. Kirk Ellis, a physical therapist at BCRH during Young's stay, identified the safety rules and testified that they were used in the gym at BCRH for working with the patients. He also testified the rules applied to every patient in the hospital and that the rules would not be inconsistent with rules applicable in the hospital setting as opposed to the gym setting. Ellis explained that the safety rule requiring that the patient wear footwear that will not slip on the floor should be followed. Though the purpose of the rule is self-evident, Ellis testified that footwear is necessary so that the patient will not slip. Ellis also testified that because Young did not like to wear footwear, a dycem or rubber mat was used in the gym when working with her to prevent her from slipping. Ellis did not believe that nurses would know to use a dycem in the hospital setting. He explained that therapists have more knowledge about how to conduct transfers since they are trying to push the patients to be more independent. However, personnel in a hospital setting would take a more "hands on" approach in transferring patients because hospital personnel are "taught that they are supposed to do everything for the patient." Ellis also testified that during her stay at BCRH, Young had progressed to performing "minimum assist" transfers, but there was no explanation in the record as to what exactly that entailed when a patient, such as Young, was elderly, obese, and had only one leg that was weakened from childhood polio.
Theresa Christian, an occupational therapist at BCRH, also worked with Young during her stay. Christian was familiar with the safety rules. She noted that Young usually wore a regular cotton sock, therefore a mat would be used during therapy. Christian explained that more safety devices were used in therapy because the purpose is to push the patients, whereas in a hospital setting, the personnel are only trying to make the transfer.
Young also presented expert testimony from Timothy Jones, an occupational therapist, and Albert David Green, a physical therapist. Jones opined that the transfer was not performed properly, particularly because Young was not wearing appropriate footwear to prevent her from slipping. We note that Jones mistakenly believed that Young fell to the floor. Green testified that the safety rules are basic rules to be followed on every transfer as the rules are designed to protect the patient and any person assisting with a transfer. He opined that BCRH's employees failed to take adequate precautions to ensure that Young's foot did not slip during the transfer and this failure led to her injury. Green noted that the transfer was not conducted on a non-skid surface and that Young did not have on appropriate footwear to allow her some traction on the tile *472 surface. He also opined that Young's foot was not properly blocked to keep it from slipping. Young, too, testified that her foot would not have slipped if Bailey had been standing with her foot in front blocking Young's foot.
BCRH presented the testimony of two members of the medical review panel, J. Eric Bicknell, M.D., and Don K. Joffrion, M.D. Both opined that the transfer met the standard of care and believed that the injury could have occurred either through hyperextension of the knee or by Young pushing down on the leg or knee with her weight. Interestingly, both Bicknell and Joffrion commented that the safety rules must be tailored to individual situations, such as this one involving a lady with one amputated leg and the other almost paralyzed.
The record establishes that an elderly lady, whose left leg had been amputated some years ago and who had significant health problems, entered BCRH for rehabilitation to strengthen herself so that she could remain as self-sufficient as possible and more easily handle the transfers that are part of her daily life. During the course of her stay at BCRH, Young progressed to performing "minimum assist" transfers, which involve the patient performing at least seventy-five percent of the transfer. Then, on the day before she was to be discharged, Young sustained an injury to her right leg after being needlessly imposed upon for the purpose of testing the scale.
After being weighed, Young was wheeled into the hallway to transfer to her own wheelchair. This was not a planned transfer; rather, it was performed on the spur of the moment after Polk enlisted Young's assistance to test the scale. No effort was made to ensure that Young had on footwear that would not slip even though there was a safety rule specifically addressing the need to make sure that patients have on non-slip footwear. Although Bailey testified on cross-examination that Young had on a "booty sock" with rubber grips on the foot of the sock, she did not testify that she actually checked Young's foot to make sure that it was a nonslip sock. When first questioned, Bailey recalled only that Young was wearing a sock. Other testimony indicated that Young normally wore regular cotton or nylon socks. The evidence establishes that although Young was wearing a sock of some sort, her foot slipped. Apparently, the sock was not sufficient as a non-slip device nor was Young's foot being blocked from slipping.
Though there was expert testimony indicating that Young's injury could have been caused either by hyperextension or pushing down with her weight, the eyewitness accounts establish that Young's foot slipped and her knee hyperextended. Both Polk and Bailey observed that Young's leg was hyperextended. In addition, Bailey testified that Young's foot slipped. Whether this slip occurred midway through the transfer as Young contended or while Young attempted to push herself back into her seat as Bailey testified, the fact remains that a slip occurred and that an injury resulted. We have no doubt that the common sense rule requiring non-slip footwear serves to protect the patient not only during the transfer between chairs but also in any maneuver performed by the patient to become comfortably seated in the recipient chair. This is especially so where the patient must use her leg or foot to push back into the chair. We note that Polk testified that the safety rules were consistent with rules that would apply in the hospital. We find that the evidence establishes that basic, common sense safety rules for transferring were to be followed both in the *473 gym and hospital setting. Such rules would be especially important in the hospital setting where transfers are conducted by personnel lacking the specialized skills of physical and occupational therapists and where personnel are expected to take a more "hands on" approach and do more for the patients to successfully and safely complete the transfer.
Under the facts and circumstances of the case, we find that the jury was manifestly erroneous in concluding that BCRH was not negligent in its treatment of Young. BCRH used Young to test its scale and then failed to follow the most basic safety rule to ensure that Young could safely transfer back to her own wheelchair after being weighed. Young's foot slipped, her knee hyperextended, and a fracture resulted. Weeks of progress were undone by the negligence of BCRH's employees. The facts that Young may have performed similar transfers each day in her room on a tile floor or that she was able to perform "minimum assist" transfers are not persuasive, since it is this transfer only that is at issue. The specific facts and circumstances at issue here convinces us that BCRH failed to exercise the degree of care owed Young to protect her from the harm of injury during a transfer, particularly a transfer that was wholly unnecessary. Accordingly, we must reverse the trial court's judgment and find in favor of Young on her claim of medical malpractice.
The appellate court shall render any judgment which is just, legal and proper upon the record on appeal. La. C.C.P. art. 2164. When the trial court has erred in rejecting the plaintiff's claim, and the record on appeal is complete, then the appellate court may review the evidence and make an appropriate award of damages. Byrd v. Bossier Parish School Board, 543 So.2d 35 (La.App. 2d Cir.1989), writ denied, 550 So.2d 628 (La. 1989).
The record establishes that Young sustained a nondisplaced tibial plateau fracture just below her right knee joint. She was treated by Dr. Douglas Brown, an orthopaedic surgeon, who testified that Young's knee was immobilized for about one month, and she was treated with pain medication. By October 30, 2000, the fracture was healing well, and Young could bend the knee seventy degrees. By December 4, 2000, Young still complained of pain, and there was some tenderness on the upper part of the tibia. However, x-rays showed that the fracture had healed. Young could bend her knee to a right angle, and her ligaments were strong. Brown testified that even though the fracture was healed, pain might last up to a year. While he initially believed that Young might be a candidate for joint replacement surgery, his opinion changed once he became aware of the significant health problems that Young had been experiencing. He concluded that she would receive no benefit from surgery. Finally, Dr. Brown testified that the injury hastened the progression of Young's arthritis, and he assigned a thirty percent disability rating to her knee.
Young testified that her leg hurts whenever she puts pressure on it, though she candidly admitted that her weight may also be part of the problem. The pain and weakness hinders her ability to transfer as needed in her daily life. Overall, she is less active than prior to the injury. Because of the injury, Young was unable to take a trip that she had planned for after her stay at BCRH. Finally, the record establishes that Young has also suffered a number of serious health problems that are unrelated the injury at issue, and that these problems have likely been the most significant factor in her ability to be less *474 active. She has had congestive heart failure, and she has been placed on dialysis.
Citing Varnell v. Louisiana Tech University, 30,260 (La.App.2d Cir.2/25/98), 709 So.2d 890, writ granted, 98-0785 (La.6/5/98), 720 So.2d 1203, and writ denied, 98-0776 (La.6/5/98), 720 So.2d 680, and Carpenter v. Hartford Fire Ins. Co., 537 So.2d 1283 (La.App. 2d Cir.1989), Young argues that she is entitled to an award of no more than $325,000 and no less than $170,000. We disagree as both of these cases involved victims whose injuries required surgery and who were rendered disabled from the incident of negligence. Here, considering the plethora of health problems afflicting Young both prior to and after the incident at BCRH, the fracture she suffered had only a minimal impact on her overall physical condition and quality of life.
In Lilly v. Allstate Ins. Co., 577 So.2d 80 (La.App. 1st Cir.1991), writ denied, 578 So.2d 914 (La.1991), the court found that $20,000 was a reasonable award of damages for a nondisplaced fracture of the knee which resulted in arthritis, some continuing pain, and a ten percent disability of the right leg. In Hinton v. Wal-Mart Stores, Inc., 33,557 (La.App.2d Cir.6/21/00), 764 So.2d 203, a jury awarded general damages in the amount of $10,000 for a 63 year old plaintiff who sustained a non-displaced fracture of the knee.
In the instant case, Young's nondisplaced fracture healed within two months, though she continued to experience some pain. Young was already disabled when her injury occurred and suffering from an assortment of serious maladies. Apparently, her health has continued to decline due to conditions unrelated to the injury she suffered at BCRH. Under the facts and circumstances of this case, we believe that an award of general damages in the amount of $20,000 is sufficient to compensate Young for her injuries. We find no basis in the record for an award of special damages.

CONCLUSION
For the aforementioned reasons, we reverse the judgment of the trial court and render judgment in favor of the plaintiff, Gertrude Young, on her claim of medical malpractice against the defendants, Bernice Community Rehabilitation Hospital and Continental Casualty Company. Damages in the amount of $20,000 are hereby awarded to Young, and all costs are assessed to the defendants.
REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, PEATROSS, and LOLLEY, JJ.
Rehearing denied.
GASKINS, J., would grant rehearing.