11 STEWART, J.
In this medical malpractice action, the jury determined that none of the defendants breached the standard" of care in their treatment of the plaintiff, Mattie Murphy. On appeal, Ms. Murphy argues that the evidence does not support the jury’s verdict. Having thoroughly reviewed the record, we find no manifest error in the jury’s verdict, and we affirm the trial court’s judgment dismissing Ms. Murphy’s claims.
FACTS
At the age of 81, Ms. Murphy suffered from various ailments, including hypertension, diabetes, and severe arthritis particularly affecting her left knee. Ms. Murphy lived in her own home, but she was having increasing difficulties getting around and performing the activities of daily living (“ADL’s”). She regularly sought medical treatment from Drs. Mark Shaw and Bryan Harris at the Tri-Ward Clinic in Bernice, Louisiana.
On March 13, 2002, Ms. Murphy saw Dr. Harris for complaints of vertigo and leg weakness. He performed a carotid ultrasound which was negative for blockage. Continued dizziness and signs of facial drooping caused Ms. Murphy’s family to have her examined at Lincoln General Hospital’s emergency room on March 21, 2002. The physician ordered a CT scan of her head which was negative. Ms. Murphy was diagnosed with Bell’s palsy, prescribed medication, and sent home.
On Monday, March 25, 2002, Ms. Murphy was seen by Dr. Shaw. Ms. Murphy’s daughter expressed concerns to him about her mother experiencing left-sided weakness, mouth drooping, and recent changes in her mental status. After reviewing the carotid ultrasound ordered by Dr. | ^Harris and the CT scan done that weekend at Lincoln General, Dr. Shaw agreed with the diagnosis of Bell’s palsy. He also found Ms. Murphy to have general debility, and he believed that she might benefit from treatment in a rehabilitation hospital. The family also believed that rehabilitation would help Ms. Murphy. Accordingly, Ms. Murphy was admitted to Bernice Community Rehabilitation Hospital (hereafter “BCRH”).
Dr. John Mays, an orthopedic surgeon who did admissions at BCRH, examined Ms. Murphy on March 26, 2002. Her chief complaints were debility, severe left knee pain, and difficulty performing her ADL’s. He noted that she had recently been diagnosed with Bell’s palsy. His examination showed her to have left-sided facial palsy, some slurring of speech, and generalized muscle atrophy in her legs. Dr. Mays noted a severe valgus deformity (a buckled knee condition) of her left knee with severe crepitation (popping or cracking sounds with movement of joints), a large effusion (fluid in the knee), and decreased range of motion. He injected her knee with Depo-Medrol and Lidocaine in prepa *358 ration for her to begin an intensive physical therapy and occupational therapy program. He also determined that she would benefit from speech therapy for her facial palsy.
According to the nurse’s notes from the day of her admission to BCRH, Ms. Murphy had some left-sided weakness with a swollen and painful left knee. No physician had noted objective signs of left-sided weakness in Ms. Murphy. The nurse’s notes stated that Ms. Murphy would |,.¡require assistance with her ADL’s and with ambulation and that she would use a wheelchair.
On March 27, 2002, Ms. Murphy’s knee gave out while an aide was assisting her in the bathroom. The aide lowered Ms. Murphy to the floor with Ms. Murphy’s left leg extended in front of her and her right leg turned back at the knee. Because she weighed about 250 pounds, other nurses and technicians assisted in getting Ms. Murphy off the floor and into a chair. She had no significant complaints of pain at the time of the incident, and later that day she was able to sit in a chair while visiting with one of her daughters. However, she was given Ultram, a mild pain medication, for swelling and pain in her left knee. After the incident, BCRH began using a Hoyer lift, a type of mechanical sling, when transferring Ms. Murphy.
On March 28, 2002, Ms. Murphy participated in physical therapy and was examined by Dr. Shaw, who was apprised of the incident. He noted a bit of effusion in her left knee, but he did not detect any injury apart from her arthritis. Ms. Murphy complained of pain to her left knee and top area of the left knee later that day. On March 29, 2002, Ms. Murphy again participated in physical therapy in the morning, but she was more lethargic than usual. Her daughter found her slumped over in her chair, confused, and disoriented. BCRH contacted a physician and arrangements were made to transfer Ms. Murphy to Minden Medical Center (“MMC”) for a CT scan. She was admitted to MMC when the scan showed that she had suffered a stroke.
I ¿The stroke caused left-sided paralysis in Ms. Murphy. MMC’s records document some ongoing complaints of leg pain. Then, on April 1, 2002, sometime after undergoing a hip x-ray, she had an upsurge in the severity of the pain to her left knee area. She reported that her left knee was “killing” her, and she was unable to scale the pain on the pain chart. X-rays taken of her left knee and thigh on April 2, 2002, revealed a fracture of her left femur just above the knee. Surgery was performed on the fracture. She was unable to participate in rehabilitation following her stroke and had to be placed in a nursing home for care. ■
Following these events, Ms. Murphy instituted a medical malpractice action against Dr. Harris, Dr. Shaw, Dr. Mays, and BCRH. The claims against Dr. Harris were dismissed prior to trial and are not at issue in this appeal. The grounds of this malpractice action are the failure to diagnose the stroke prior to March 29, 2002, and the allegation that she broke her left femur at BCRH on March 27, 2002. A medical review panel found in favor of the defendants upon concluding that none of them breached the standard of care in treating Ms. Murphy. The matter proceeded to a jury trial, which resulted in a verdict in the defendants’ favor. The jury concluded that none of the defendants breached the standard of care in treating Ms. Murphy. The trial court rendered a judgment dismissing Ms. Murphy’s claims after denying motions for a JNOV and a new trial. This appeal followed.
*359 DISCUSSION
The applicable standard of review requires that the jury’s conclusions not be set aside in the absence of manifest error or unless clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La. 1993). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be clearly wrong or manifestly erroneous. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Physician Malpractice
In a medical malpractice action against a physician as provided by La. R.S. 9:2794, the plaintiff must prove the applicable standard of care, a violation or breach of the standard of care, and a causal connection between the alleged negligence and the resulting injuries. Johnston v. St. Francis Medical Center, Inc., 35,236 (La.App. 2d Cir.10/31/01), 799 So.2d 671, 674-675. Opinions of expert witnesses from the relevant medical professions are necessary to determine the standard of care and whether the defendant breached the standard of care. Strange v. Shroff, 37,353 (La.App. 2d Cir.7/16/03), 850 So.2d 1077, 1086. Physicians are not held to a standard of absolute precision; rather, their conduct and judgment are evaluated in terms of reasonableness under the then-existing circumstances. Brown v. Eppinette, 36,405 (La.App. 2d Cir.12/18/02), 833 So.2d 1268, 1273; Johnston, supra. Physicians’ actions are not to be evaluated on the basis of hindsight or in light of subsequent events. Johnston, supra.

Claims Against Dr. Mays

Ms. Murphy claims that Dr. Mays had a duty to determine her “weight-bearing status.” She also claims that Dr. Mays should have |ficonsidered the nurse’s assessment of left-sided weakness noted at the time of her admission to BCRH in determining whether she was ready to begin therapy.
Dr. Mays ig an orthopedic surgeon who examined patients upon admission to BCRH. He testified that the purpose of the examination is to determine whether the patient has any condition requiring acute treatment. The examination is not to determine “weight-bearing status.” Dr. Mays explained that every rehabilitation patient has some type of weight-bearing restriction or else they would not be in need of therapy. Dr. Mays also testified that he did not detect any left-sided weakness in his examination of Ms. Murphy.
Plaintiff presented the testimony of Dr. Richard Smith, a specialist in internal medicine. Dr. Smith noted that Dr. Mays did not address symptoms indicative of a stroke when he examined Ms. Murphy, but Dr. Smith also noted that diagnosing a stroke would not be in Dr. Mays’ area of practice. Dr. Smith testified that a physical therapist would be the person to determine a patient’s weight-bearing status. As an internist, Dr. Smith had no opinion as to whether Dr. Mays breached the standard of care required of an orthopedic surgeon examining a patient for rehabilitation.
Neither Dr. Smith nor any other expert witness testified that Dr. Mays failed to meet the standard of care in treating Ms. Murphy. Dr. Mays examined Ms. Murphy on one occasion. He administered medication for her knee pain so as to enable her to participate in physical therapy. He did not find any left-sided weakness or any condition to indicate that she should l7not *360 be in therapy. The record shows that Ms. Murphy was able to bear her own weight and ambulate to some degree upon entering BCRH, but her ability to do so was adversely affected by her severely arthritic left knee. In the absence of any expert testimony that Dr. Mays failed to meet the standard of care in his single examination of Ms. Murphy, we find nothing in our review of the record to suggest that the jury’s finding regarding Dr. Mays was either manifestly erroneous or clearly wrong.

Claims Against Dr. Shaw

Ms. Murphy claims that Dr. Shaw failed to meet the standard of care in treating her at Tri-Ward Clinic and in his examination of her at BCRH. She asserts that Dr. Shaw did not recognize that she was having symptoms of a stroke when he treated her on March 25, 2002, and did not make a definitive diagnosis of her condition. She claims that he should have ordered a repeat CT scan on March 25, 2002, because indications of a stroke often take 24 to 48 hours to appear on a CT scan. She also asserts that Dr. Shaw should have reviewed the nurse’s notes at BCRH which would have apprised him of the left-sided weakness assessment and would have prompted him to then order the repeat CT scan on March 28, 2002. Also, she asserts that Dr. Shaw breached the standard of care in failing to diagnose her broken femur on March 28, 2002.
When Dr. Shaw treated Ms. Murphy on March 25, 2002, he obtained and reviewed copies of the carotid ultrasound ordered by Dr. Harris on- March 13, 2002, and the CT scan done at Lincoln General Hospital. The Tri-Ward Clinic records indicate that Ms. Murphy’s daughter accompanied |Rher and reported symptoms of left-sided weakness, mouth drooping, and changes in mental status. Based on all the information he had, Dr. Shaw determined that there was no reason to repeat the CT scan or treat Ms. Murphy as a stroke victim. Instead, he agreed with her family that she might benefit from a stay in a rehabilitation hospital, and he arranged for her admission to BCRH. He testified that Ms. Murphy’s ability to perform her ADL’s had dramatically decreased from 1999 to 2002.
Plaintiffs expert, Dr. Richard Smith, testified that Dr. Shaw should have repeated the CT scan on March 25, 2002, to determine whether Ms. Murphy had suffered a stroke. He testified that left-sided weakness, slurred speech, and disorientation are indicative of stroke rather than of Bell’s palsy. He believed that Ms. Murphy should have been admitted to an acute care hospital until her condition stabilized before beginning rehabilitation. However, Dr. Smith knew of no treatment that would have prevented the stroke, and he had no opinion as to whether her outcome would have differed if she had been hospitalized for observation on March 25, 2002. Dr. Smith was the only expert witness to testify that Dr. Shaw breached the standard of care in failing to diagnose or properly treat Ms. Murphy as a stroke patient.
Dr. Thomas L. Morris is an internist who began treating Ms. Murphy in April 2002. He believed that Dr. Shaw met the standard of care in diagnosing Bell’s palsy and in referring Ms. Murphy to BCRH for rehabilitation. He testified that considering her test results, he would have made the same diagnosis and decision. Moreover, he did not believe that 19any delay in treating Ms. Murphy as a stroke patient affected her outcome. Dr. Morris disagreed with the assertion that a physician has duty to review the nurse’s notes. He testified that physicians will generally talk to the nurses to get up-to-date on a patient’s condition and will read the progress notes taken by the physicians.
*361 Dr. Chris Earnhardt, a family physician who treated Ms. Murphy while at MMC, also testified that Dr. Shaw did not breach the standard of care in not ordering a repeat CT scan or diagnosing the stroke on March 25, 2002. He explained that Ms. Murphy’s daughter reported subjective complaints but that Dr. Shaw’s objective findings did not include left-sided weakness. He noted that no other physician, including Dr. Mays, had then detected any left-sided weakness, and he testified that he would rely on his own findings or another physician’s findings over a nursing assessment of left-sided weakness.
Finally, Dr. Don K. Jofirion, an orthopedic surgeon who was a member of the medical review panel, also testified that Dr. Shaw met the standard of care in treating Ms. Murphy on March 25, 2002. He believed that Bell’s palsy was an appropriate diagnosis at the time, though in hindsight and with the benefit of all the medical information, it appeared that she began having symptoms of an evolving stroke as early as March 13, 2002. However, he concluded that even if her stroke symptoms had been diagnosed earlier, there was nothing to be done to prevent it.
The parties presented conflicting testimony as to whether Dr. Shaw should have ordered a repeat CT scan on March 25, 2002, before referring |inMs. Murphy for rehab. However, the experts were in agreement that an earlier diagnosis would have had no effect on her outcome and would not have prevented the stroke. It is the jury’s function to evaluate expert opinions in relation to all the circumstances of the case. Johnston, supra; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). We cannot say that the jury was manifestly erroneous in finding that Dr. Shaw did not breach the standard of care in failing to order a repeat CT scan or diagnose stroke symptoms on either March 25, 2002, or March 28, 2002.
Ms. Murphy also claims that Dr. Shaw committed malpractice in failing to detect her broken femur on March 28, 2002, when he examined her during his rounds at BCRH. Ms. Murphy contends that she broke her femur in the incident on March 27, 2002, when she was lowered to the floor after her legs gave out. Katie Smith and Tonya Stephens, two of Ms. Murphy’s daughters, were present when Dr. Shaw examined their mother on March 28, 2002. Both testified that Dr. Shaw only looked at the leg and then concluded that her pain was due to arthritis. However, Dr. Shaw testified that he was told about the incident and that he examined Ms. Murphy’s leg. He noted that she had a bit of effusion and pain in the knee, but that the pain and swelling were actually less than when he had last seen her. He found no bruising around the knee. He testified that he found nothing in his exam indicative of a fractured femur. Moreover, he believed it absurd that no physician would have detected a fractured femur for over six days from when the injury allegedly occurred.
InNo expert testified that Dr. Shaw’s failure to detect the fracture or order an x-ray on March 28, 2002, breached the standard of care owed by him as a general practice physician. As explained by Dr. Mays, Ms. Murphy was a patient who had been having difficulties with ongoing knee pain from arthritis. She was not a patient who suddenly went from walking to being unable to do so after an accident. He believed that it was within the standard of care for Dr. Shaw to determine that no x-ray was needed. The record shows that Ms. Murphy had pain and swelling associated with her left knee prior to the accident, and her complaints continued after the accident. However, the record does *362 not suggest any particular increase in complaints of pain or swelling attributable to the incident or other evidence suggestive of a broken femur as of the time of Dr. Shaw’s examination on March 28, 2002. In the absence of any expert testimony that Dr. Shaw breached the standard of care in not detecting a broken femur in his examination of Ms. Murphy on March 28, 2002, we find no manifest error in the jury’s verdict exonerating Dr. Shaw from fault. Hospital Malpractice
In a malpractice action against a hospital, the mere occurrence of an injury or accident, alone, does not raise a presumption of negligence on the part of the hospital. Galloway v. Baton Rouge General Hospital, 602 So.2d 1003 (La. 1992). Hospitals must exercise the requisite care toward a patient that the patient’s condition may require. Borne v. St. Francis Medical Center, 26,940 (La.App. 2d Cir.5/10/95), 655 So.2d 597, 599, writ denied, 95-1403 (La.9/15/95), 660 So.2d 453; Hunt v. Bogalusa Community Med. Center, 303 So.2d 745, 747 (La.1974). This duty requires a hospital to protect the patient from dangers that may result from the patient’s physical and mental incapacities as well as from external circumstances peculiarly within the hospital’s control. The determination of whether the hospital breached this duty of care owed the patient depends on the facts and circumstances of each particular case. Borne, supra.
Ms. Murphy argues that BCRH’s failure to follow various safety rules led to her breaking her femur and prevented discovery of the injury after the accident. She asserts that BCRH failed to follow its policy for patients at risk for falling. Under this policy, BCRH should have either encouraged family to stay or provided a sitter for Ms. Murphy. She also contends that BCRH’s aides were not informed of her fall risk or left-sided weakness; thus, they neither used proper equipment, particularly a gait belt, nor called for additional assistance to transfer her in the bathroom. Additionally, BCRH assigned an aide who was 7 months pregnant and could not provide proper assistance to a woman of Ms. Murphy’s size. Ms. Murphy also argues that BCRH did not follow its first aid fall policy in that no one called a physician to examine her immediately after the fall. She claims that this failure denied her a definitive diagnosis of her injury when it occurred. Lastly, Ms. Murphy contends that BCRH should have informed a physician once a nurse assessed left-sided weakness at admission and should have restricted her walking or standing until her symptoms abated.
Testifying as an expert in nursing on behalf of Ms. Murphy, Shelly Hebert asserted that BCRH did not meet the standard of care in treating Ms. |13Murphy. Hebert asserted that the nurses did not devise a plan of care to address Ms. Murphy’s needs. She testified that BCRH did not follow through on its fall risk assessment by providing a sitter or baby monitor in the room or encouraging Ms. Murphy’s family to stay with her. Hebert testified that BCRH violated its transfer safety rules by not providing Ms. Murphy with an aide with sufficient strength to assist her and by not providing proper equipment, such as a gait belt, to safely transfer Ms. Murphy. She did not believe there was enough room for a safe transfer in the bathroom and suggested that the aides should have used a potty chair next to Ms. Murphy’s bed. Hebert also testified that BCRH’s actions fell below the standard of care after the incident when no one called a physician to examine Ms. Murphy. On cross-examination, Hebert admitted that it was appropriate for an aide to get behind Ms. Murphy to cushion her as she was *363 lowered to the floor. She also admitted that BCRH’s records showed no complaints by Ms. Murphy after the incident.
The two aides assisting Ms. Murphy at the time of the incident also testified. La-vonia Holmes Robinson, who was 7 months pregnant, was assigned to Ms. Murphy but testified that she did not have much recall of the incident. She did recall entering the bathroom and seeing Ms. Murphy propped up on the knees of Latasha Watson Robinson, who eased Ms. Murphy to the floor with the right leg turned at the knee toward the back. Lavonia then went to get help.
Latasha testified that Lavonia’s pregnancy was the reason she was helping her with Ms. Murphy. When Ms. Murphy said that her leg was | ^giving out, Latasha got behind her and eased her to the floor as she had been trained to do. She stated that Ms. Murphy’s left leg was extended straight out in front of her and the right leg was bent behind at the knee. Lavonia went for help, and then a nurse came to assist and straightened Ms. Murphy’s leg. Latasha testified that she heard the right leg pop. She also testified that Ms. Murphy complained about some pain but did not specify which leg was bothering her. Latasha testified that she was not aware that Ms. Murphy was a fall risk, but she would have asked for more help or for instructions from the physical therapist if she had known of the fall risk. However, Latasha did not believe that a gait belt would have helped. She would have still had to lower Ms. Murphy to the floor once her leg gave out. Moreover, she understood that Ms. Murphy was a maximum assist patient. Several days after the incident and after Ms. Murphy was at MMC with a stroke and broken leg, Latasha wrote an accident report in which she explained that she heard a pop when Tammy moved the leg from behind Ms. Murphy and assumed the leg was broken.
Ms. Murphy cites In re: Medical Review Panel For The Claim of Gertrude Young v. Bernice Community Rehabilitation Hospital, 38,402 (La.App. 2d Cir.4/07/04), 870 So.2d 467, writ denied, 2004-1402 (La.9/24/04), 882 So.2d 1132, in support of her claim that BCRH was negligent in failing to follow its safety rules for transferring patients. In Ms. Young’s case, she was not wearing nonslip socks as required by the safety rules when she was imposed upon for testing a scale. We found that basic, common sense safety rules for transferring patients were to be followed in the Inhospital setting. The lack of nonslip footwear was an obvious cause of Ms. Young’s foot slipping and resultant injury.
However, in this case, the record does not establish that the alleged violations contributed to the incident. Ms. Murphy did not fall or injure herself due to lack of equipment or insufficient supervision or assistance. Rather, her legs grew weak, and the aide lowered her to the floor as she had been trained to do. Nurses assisted in placing Ms. Murphy in a comfortable position and getting her off the floor. Ms. Murphy denied being injured and no complaints of unusual pain were reported at the time of the accident.
The jury could have reasonably concluded that BCRH did not breach the standard of care by failing to follow the transfer safety rules requiring personnel to use necessary equipment for transfers and to call for assistance if needed. The only equipment suggested for use was the gait belt; however, Latasha testified that she would have still had to lower Ms. Murphy to the ground even if she had been using the gait belt. Although Latasha testified that she was not aware of Ms. Murphy’s fall risk and that she would have sought *364 assistance if she’d known, her alleged lack of awareness must be considered with her testimony that she knew Ms. Murphy was to be a maximum assist patient. One obvious reason for Ms. Murphy requiring maximum assistance is that she was at risk for falling. Because of this risk, Ms. Murphy was being assisted and had the use of a wheelchair as provided in the nurse’s notes at the time of her admission to BCRH. The record does not establish that Latasha required additional assistance with Ms. Murphy as she was able to ease her to the ground as she |ir,had been trained to do. However, she did require assistance to get Ms. Murphy off the ground and sought such assistance as required by BCRH’s safety rules for transfers.
The jury could have also reasonably concluded that BCRH did not breach the standard of care in failing to follow its policy on patients assessed as fall risks. Ms. Murphy’s room was four doors away from the nurse’s station'—the closest available at the time of her admission. Ms. Murphy was alert and oriented. As explained by Barbara Polk, BCRH’s director of nursing in 2002, Ms. Murphy was shown to push the call button for assistance. She was not the type of confused patient who required the 24 hour attention of a sitter or family member. Nothing in the record suggests that the alleged failure to comply with the fall risk policy contributed to the incident at issue.
It was also reasonable for the jury to conclude that BCRH did not breach the standard of care by not contacting a doctor at the time of the incident. BCRH’s first aid policy for falls provides that a patient who has a painful area, bumps, or limbs in an unnatural position should be permitted to remain on the ground, help should be summoned to call a doctor, and the doctor’s orders should be carried out. If a fracture or major injury is suspected, the patient should be made comfortable until an emergency medical unit arrives. There was some testimony that a “pop” was heard when the right leg was straightened and that some of BCRH’s employees suspected this indicated a fracture. However, the testimony and circumstances suggest that the “pop” was from the right leg; the fracture |17diagnosed over six days later was of the left femur. Thus, the record establishes no connection between the “pop” and the fracture. Ms. Murphy’s left leg was positioned straight out in front of her and was not in an unnatural position. The record does not establish that she was in any great pain following the incident. In fact, BCRH’s medical records show that she had no complaints following the incident. Tammy Thomas, the nurse who straightened Ms. Murphy’s right leg, testified that she asked Ms. Murphy if she was hurt, and Ms. Murphy said she was not. We find that the jury could have determined that BCRH did not violate its first aid fall policy as there was no indication that Ms. Murphy was injured from being eased to the ground or that she had fractured her left femur.
From our review of the record, we believe the jury could have concluded that Ms. Murphy did not fracture her left femur when alleged. The record is replete with expert testimony describing the severe, excruciating pain that a fractured femur would cause. Such intense pain would not be overlooked for six days by medical professionals. The medical experts testified that a femur fracture would inhibit movement of the patient and would be noticeable due to the lack of control a patient would have over the leg. The record is also replete with instances after the incident of March 27, 2002, of Ms. Murphy exercising at physical therapy and being moved about without any indications of the type of intense pain or problems that a *365 person with a broken femur would likely exhibit. Ms. Murphy had pain in the area of her left knee along with swelling upon her admission to BCRH, and she complained of pain to varying degrees | ^throughout her stay there. However, the record establishes that she began having a more intense pain on April 1, 2002, while at MMC and that the quality of these complaints suggested that a major injury was present. The experts largely agreed that the fracture likely occurred sometime on April 1, 2002.
Lastly, we find that the jury could have reasonably concluded that BCRH did not breach the standard of care by failing to advise a physician about the nursing assessment of left-sided weakness made on March 25, 2002. First, we do not know whether the nurse made this determination or whether the nurse charted what was reported by Ms. Murphy or her daughter. Second, when Ms. Murphy went to Dr. Shaw’s office that same day, her daughter told Dr. Shaw that Ms. Murphy had left-sided weakness, but Dr. Shaw did not detect objective signs of such weakness when he examined Ms. Murphy. Dr. Mays also did not detect any left-sided weakness when he examined Ms. Murphy on March 26, 2002. Third, BCRH took steps to address Ms. Murphy’s condition by determining that Ms. Murphy would require assistance with her ADL’s and with ambulation and that she would use a wheelchair. Our review of the record reveals no manifest error in the jury’s finding that BCRH did not breach the standard of care in its treatment of Ms. Murphy.
CONCLUSION
For the reasons stated in this opinion, we affirm the trial court’s judgment dismissing Ms. Murphy’s claims against Dr. Mays, Dr. Shaw, and Bernice Community Rehabilitation Hospital. Costs assessed to appellant.
AFFIRMED.